IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,                              REPORT AND
                                                       RECOMMENDATION
                         Plaintiff,
            v.                                         12-cr-83-bbc

DARIUS HOWARD,

                         Defendant.
_____

## REPORT

On July 11, 2012, the grand jury indicted defendant Darius Howard (and codefendant Marcus Johnson) with possessing cocaine base (crack cocaine) with intent to distribute it and with being a felon in possession of a 9mm pistol.  Both charges arise out of Howard's May 15, 2012 warrantless arrest by Fitchburg police officers.  Howard has moved to suppress the crack found on his person, and his post arrest statements (but not the firearm), claiming that they were derived from an unreasonable seizure and unreasonable search. *See* dkt. 19.  For the reasons sated below, I am recommending that the court deny Howard's motion to suppress evidence.

Johnson has submitted police reports of his May 15, 2012 encounter with the Fitchburg police (dkt. 19-1) and on September 27, 2012, this court held an evidentiary hearing on Johnson's motion (transcript, dkt. 26).  Having considered the written exhibits and having heard, seen and judged the credibility of the witnesses, I find the following facts:

## Facts

On May 8, 2012, Christopher Curry came to the Fitchburg Police Department to report that on the previous Friday night, May 4, 2012, two men had pistol-whipped him at Schneid's

Bar, causing a twelve-stitch head wound.[1]  Follow-up investigation corroborated Curry's report. On May 9, 2012, through photo arrays, Curry identified Marcus Johnson and Zahmall Davis as his assailants.  Following additional investigation, Fitchburg Police Detective Matthew Wiza concluded that he had probable cause to arrest Johnson and Davis for substantial battery, with a handgun enhancer.  Detective Wiza also learned that Johnson was a person of interest regarding a May 2012 shooting at Penn Park in Madison (just north of Fitchburg).  Based on his investigation, Detective Wiza believed that Johnson was driving a silver Kia Sedona minivan with a known license plate, and that Davis was living with his girlfriend at 1901 Greenway Cross, Number 8 in a multi-building apartment complex in Fitchburg. The Fitchburg police consider the Greenway Cross neighborhood a high "call-for-service area," including offenses involving knives, shots fired, and other gun calls.

On May 15, 2012 at about 6:45 p.m., Detective Wiza, in civilian garb, drove to the Greenway Cross complex and parked his unmarked car where he could watch the parking lot, which was south of the apartment building.  It was still light out.  Not but five minutes later, a silver Kia minivan drove into the lot and backed into a stall south of apartment No. 8.  Detective Wiza thought he saw two African American men in the van (Johnson and Davis are African American), so, notwithstanding the facts that he viewed this as a "high-risk contact" with a suspect who possibly was armed with a handgun, he had no backup on site and he was carrying only one pair of handcuffs, Detective Wiza decided to approach.[2]  He radioed dispatch to

---

[1]  The parking lot of which was the scene of a March 21, 2012 firearm incident that also got charged in federal court, *see United States v. Andre Williams*, 12-cr-54-wmc.

[2]  Detective Wiza *had* outlined the investigation and his surveillance plan to Fitchburg Patrol Officer Michael O'Keefe, who then made it a point to stay near Greenway Cross that afternoon.

request backup, got out of his car, drew his sidearm and starting walking toward the two men, who by now had stepped out of the van Detective Wiza positively identified one of the men as Johnson. (The other man later was identified as Christopher Carthans). Detective Wiza walked toward Johnson and Carthans, who were walking north away from the van toward the apartment. His intent was to arrest Johnson for the pistol-whipping incident at Schneid's.

As Detective Wiza got within 15-20 feet of Johnson and Carthans, he looked over his right shoulder and noticed two *more* men getting out of the minivan. Wiza hadn't realized there were four men in the minivan when he decided to approach Johnson and Carthans alone. These two men were 15-20 feet to Detective Wiza's right, putting him midway between the two pairs. Detective Wiza did not know who the third man or fourth man were. (They later were identified as Darius Howard and Ari Williams). Finding himself unexpectedly outnumbered and outflanked in a dangerous neighborhood while approaching a gun crime suspect, Detective Wiza deemed himself to be in "a bad situation."

For his own safety, Detective Wiza decided to detain everyone until he could at least "stabilize the situation." Detective Wiza initially had pointed his firearm at Johnson and Carthans, but then swung to his right and pointed it toward Howard and Williams. Detective Wiza ordered all four men to the ground; Howard and Williams complied; Detective Wiza could not see if Johnson and Carthans complied. (They did not).

As Detective Wiza approached Howard and Williams, Officer O'Keefe drove in from the east entrance to the parking lot and stopped about 20 feet east of the Kia van. Detective Wiza was not sure if Officer O'Keefe could see Johnson and Carthans, so he alerted Officer O'Keefe to their presence near the apartment building. Officer O'Keefe approached Johnson and

Carthans with his firearm drawn.  As he walked past the Kia, Officer O'Keefe saw a bloody T-shirt on the van's floor.  Officer O'Keefe ordered Johnson and Carthans to the ground face down with their arms splayed straight out from their sides.  Both men initially complied.  Officer O'Keefe intended to maintain this status quo until more backup arrived, but Johnson kept reaching toward his body with his left hand despite Officer O'Keefe's orders to desist.  Knowing that Johnson was their suspect in the pistol-whipping investigation, Officer O'Keefe determined that he had to handcuff Johnson for officer safety.  As O'Keefe attempted to cuff Johnson, who was struggling, Carthans leapt up and fled west, flouting Officer O'Keefe's order to "stop!"

Officer O'Keefe continued to attempt to cuff the struggling Johnson.  Once that was done, Officer O'Keefe searched Johnson incident to arrest and found crack cocaine in a clothing pocket.  Officer O'Keefe also noticed that Johnson had blood spots on his pants and tennis shoes.  Officer O'Keefe placed Johnson in the back seat of his squad car, doors locked, hands cuffed behind him, and placed Johnson's crack cocaine on the front seat of the squad car.  No additional backup had arrived yet, so Officer O'Keefe went to assist Detective Wiza.[3]

While Officer O'Keefe had been attempting to obtain control of Johnson and Carthans, Detective Wiza had placed his only pair of handcuffs on Howard, who was lying on his stomach. Det, Wiza performed a quick, one-handed weapon pat down at Howard's waist while holding his firearm in his other hand.  O'Keefe and Wiza describe the scene as "very chaotic" and moving "very rapid[ly]."

---

[3] While left unattended in the squad car, Johnson contorted his cuffed hands to the front position, slid open the partition, snatched the crack and swallowed it.  This provoked a trip to the hospital for the forced voiding of over 11 grams of crack.

Officer O'Keefe noticed that both Howard and Williams had blood spattered on their pants, like Johnson. Officer O'Keefe had a second pair of cuffs, which used on Williams. Officer O'Keefe then performed weapon pat downs of both Howard and Williams, unaware that Detective Wiza already had performed a quick, partial frisk of Howard. Officer O'Keefe believed it was necessary to check both men for weapons due to the nature of the underlying offense involving Johnson, and because of the circumstances of this stop that were devolving around the two officers without any additional backup having yet arrived.

While patting Howard's right front pants pocket, Officer O"Keefe detected what he concluded was a plastic sandwich bag because of the noise it made when patted, the way it felt when patted and based on his own experiences with previous pat downs. Officer O'Keefe immediately believed that this plastic bag contained cocaine because he had just found and seized cocaine while searching Johnson incident to Johnson's arrest. Next, Officer O'Keefe squeezed the bag between his fingers, which revealed a hard substance in the bag, corroborating his belief that the bag contained cocaine. At that point, Officer O'Keefe reached into Howard's pocket and retrieved the crack cocaine (about 15 grams) that has been charged against Howard in this federal prosecution.

Additional Fitchburg officers arrived within three or four more minutes. Detective Wiza called dispatch to request information about any recent crimes that might explain the blood spattered on the men and on the T-shirt in the car. Other police searched for and captured Carthans, bringing him back to the scene. An officer with a trained canine partner retraced Carthan's flight route and found a 9mm handgun stashed in a dumpster.[4]

---

[4] Carthans pled guilty to a federal gun charge on October 16, 2012 in 12-cr-84-bbc.

Detective Wiza began to search the minivan and recovered wooden baseball bat and a loaded 9mm handgun balled up in the bloody T-shirt.  About this time, police from the City of Madison arrived and announced that Johnson, Howard, Williams and Carthans were suspects in an armed home invasion that had occurred ten or fifteen minutes earlier on the North Side of Madison, with the suspects fleeing in a silver minivan.[5]  Madison police took custody of the van and towed it to be searched more methodically.  Madison police conducted a "show-up" on the scene, got positive identifications of Howard, Williams and Carthans,[6] and took the three into Madison police custody.

Although the attorneys for both sides refer to post arrest statements made by Howard, neither the police reports (dkt. 91-1) nor any of the suppression hearing witnesses provided any evidence about these statements.

## Analysis

Howard seeks to suppress the crack found in his pocket as well as self-incriminating statements he made after his arrest.  Howard contends, in his motion (dkt. 19) and his initial brief (dkt. )that he was subjected to a full arrest and a search incident to arrest in the absence of probable cause; even if he had not been subjected to a full arrest, his detention, the two weapons frisks and the search of his pocket exceeded what is allowed for an investigative

---

[5]  I infer that this conduct underlies the state charges of armed robbery with use of force and substantial battery with intent to harm filed against Howard that same day, May 15, 2012, in Dane County Case No., 12CF967, as reported in the federal pretrial service report, dkt. 16 (sealed) at 3.

[6]  This is reported in dkt. 19-1 at 18; I surmise that Madison police drove their victim to Greenway Cross to look at Howard, Williams and Carthans but not Johnson, who had been taken to the UW hospital for a purge attempt.

6

detention.  In response, the government argues that Howard was subjected to an investigative detention and weapons frisk, that although aggressive, were reasonable under the circumstances. The government also argues that if there is any taint associated with Howard's detention, the taint was attenuated prior to Howard making any post-arrest statements.

The facts and issues presented by Howard's suppression motion are similar but not identical to those recently presented in *Unites States v. Andre Williams* (*supra*, n. 1) where the court denied defendant Williams's motion to suppress about a month ago.  *See* Opinion and Order, 12-cr-54-wmc at 34.  Defendant Williams was in a group of about 10 men in a parking lot that an anonymous 911 caller reported to be waving around guns, hollering and carrying on. A phalanx of Fitchburg police officers approached the group; despite seeing no guns at the time and having no individualized suspicion that any particular group member was armed, the police patted down the group members in the interest of officer safety.  *See* Report and Recommendation, dkt. 25 at 2-6.  So, in *Williams*, the pivot point was the same (sufficient individualized suspicion versus officer safety) and the facts were similar.  Judge Conley and I agreed that it was legitimate for the police to be concerned for their safety while approaching a group suspected of carrying firearms.  I concluded that the circumstances in *Williams* did not justify the challenged pat-down but acknowledged that the law governing *Terry* frisks[7] was so fact-specific as to be unclear as whether the pat-down was reasonable.  *See* dkt. 25 at 13.  Judge Conley concluded from the same facts that the challenged pat-down was reasonable. *see* dkt. 34 at 14.

---

[7] *See Terry v. Ohio*, 392 U.S. 1 (1968).

7

In the instant case, the court again is presented with a constellation of facts that provides support to the parties' diametric arguments. Although reasonable minds could differ, I conclude that the circumstances confronting Detective Wiza and Officer O'Keefe were even more perilous--and more obviously so–than those confronting the officers in *Williams*. As a result, the intrusive investigative detention and weapons frisks all were reasonable.

A *Terry* stop is a brief detention that gives officers a chance to verify or dispel well-founded suspicions that a person has been engaged in criminal activity. For an investigative detention to pass constitutional muster, it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the suspect's Fourth Amendment rights. *United States v. Smith*, ___ F.3d ___, 2012 WL 4676970 (7th Cir. Oct. 4, 2012).

Pertinent to Howard's situation, even when the police do not suspect that a passenger exiting a car has been involved in a crime, courts recognize that there are situations where it is constitutionally reasonable for police to detain such "innocent civilians." As the court noted in *Croom v. Balkwill*, 672 F.Supp.2d 1280, 1293 (M.D. Fla. 2009)

> Despite whatever precautions might be taken, it is inevitable that some potentially dangerous police activities will occur among private citizens. These private citizens, while wholly innocent bystanders, often may introduce additional variables at a time when the primary and legitimate goal of the police is to secure control of the situation. Failure to gain complete control of the situation may endanger the success of the police operation, as well as the safety of the innocent bystanders and law enforcement officers. Thus, police have a strong interest in securing the arrest scene, including if necessary the temporary detention of third persons who may be present.
>
> *Id.* at 1293 (quoting *Thompson v. City of Lawrence,* 1994 WL 262598 (D. Kan. 1994)

8

This comports with the Court's admonition in *Michigan v. Long*, 463 U.S. 1032, 1052 (1983), stressing that:

> a *Terry* investigation . . . involves a police investigation at close range, when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger.  In such circumstances, we have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter.

> *Id.* at 1052, emphasis in original.

Other courts share this view: "Even absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others."  *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011), *citing Michigan v. Summers*, 452 U.S. 692, 704-05 (1981); *United States v. Vaughan*, 718 F.2d 332, 334 (9th Cir. 1983)(police could detain second passenger in car while executing arrest warrants for others in the car); *see also United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993)("The fact that the officer may not suspect the individual of criminal activity does not render such a seizure unreasonable per se as *Terry* only requires specific and articulable facts which reasonably warrant an intrusion into the individual's liberty").  So, depending on the circumstances, it is not constitutionally unreasonable for an officer, while attempting to arrest his actual suspect, also to detain third parties in order to secure the scene and protect his own safety.

In accomplishing these goals, the officer is entitled to use an amount of force reasonably necessary under the circumstances confronting him.  *See Whitehead v. Bond*, 680 F.3d 919, 932 n.1 (7th Cir. 2012)("some force may be reasonable during an investigatory stop when the

9

circumstances give rise to a justifiable fear for personal safety on the part of the officer").  The reasonableness of a particular encounter depends in turn on the extend of the intrusion as well as the reason for the restraint.  Thus, when searching for suspects who are considered armed and dangerous, approaching with guns drawn and handcuffing a suspect does not necessarily transform an investigatory stop into an arrest; in fact, it would be "entirely reasonable" to do so for a brief period when the investigating officers are outnumbered, both to protect themselves and the public at large. *United States v. Smith*, *supra*, 2012 WL 4676970, citing *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994).

Indeed, when a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he is carrying a weapon.  *Id.*, n.1, also citing *Tilmon*, 19 F.3d at 1228.  In *Cady v. Sheahan*, 467 F.3d 1057 (7th Cir. 2006), the court repeated the Court's observation in *Terry* that American criminals have a long history of armed violence, with dozens of officers feloniously killed in the line of duty every year; thus,

> the protective search for weapons is a vital tool that serves the immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.

> *Cady*, 467 F.3d at 1061, quoting *Terry* at 23.

In the *Smith* case, the FBI was aware that a different suspect known to them as "Kim" was working with several other men to rob banks and using a Green Cadillac to flee.  Following a bank robbery in Evanston, Illinois on February 20, 2009, agents posted on Chicago's south side (near 73rd and May) saw the Green Cadillac pull into a parking lot and drop off a passenger.

10

When agents approached the car with guns drawn and identified themselves, the driver sped off, leaving the passenger behind. One agent handcuffed the unknown passenger (defendant Smith), performed a weapons frisk and held him for ten minutes until another agent arrived with bank surveillance photographs implicating Smith, which led to his arrest. Physical evidence obtained from Smith was used against him at trial. The court held that this was a valid *Terry* stop, in part based on the agents' suspicion that Smith had been involved in the Evanston robbery.

In this case, Howard, like Smith, was a passenger in a vehicle in a vehicle believed to contain a person wanted for arrest, but unlike Smith, Howard was not suspected of being part of any criminal activity. Even so, Detective Wiza was justified in holding Howard, Williams and Carthans at gunpoint while he attempted to stabilize what had turned into "a bad situation" for him. He found himself alone in a bad neighborhood[8] in the presence of a man suspected of being armed and violent, along with three other men he didn't know.

Howard, by counsel, questions Detective Wiza's judgment by putting himself in this predicament. This is a fair criticism, but irrelevant to the suppression analysis. Obviously it would have been more prudent for Detective Wiza to wait for backup to arrive before approaching Johnson, but the tort doctrine of comparative negligence doesn't apply to *Terry*

---

[8]     An officer's supported opinion that an area is a high-violent crime area can be considered in a probable cause analysis. Probable cause depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*–seeing what he saw, hearing what he heard. When conduct is taking place in a high-crime area, the characteristics of the location may be one factor officers consider under the totality of circumstances when detaining someone. For this factor to carry weight, there should be a reasonable connection between the neighborhood's higher crime rate and the facts relied upon to support probable cause.

*Whitehead v. Bond*, 680 F.3d 919, 932 (7th Cir. 2012), emphasis in original.

stops: either Detective Wiza was in an actually dangerous situation or he wasn't.  If he was, then it was not constitutionally unreasonable for him to use an appropriate amount of force–including aggressive detentions and weapons frisks–to protect himself.

The facts establish that Detective Wiza *was* in a dangerous situation.  Worse for him, his bid for control of this situation was precarious: given the location of the four men, he couldn't even keep an eye on Johnson and Carthans to see if they had complied with his order to hit the ground.  As Officer O'Keefe testified, they *hadn't* complied: they still were on their feet when he arrived as the first backup.  Even with two officers on the scene, stabilization eluded them: Johnson continued to writhe on the ground and Carthans bolted as soon as Officer O'Keefe turned his attention to the resistant Johnson.

Keep in mind that Officer O'Keefe also had observed indicia of violence and danger that Detective Wiza had missed: Johnson, Howard and Williams all had blood spattered on their clothing and there was a bloody T-shirt in the minivan.  Johnson was known to possess a handgun; had someone recently been shot?  This all suggested–virtually screamed–bloody murder, thus racheting up the danger factor and the officers' justifiable wariness.  It got worse: by the time Officer O'Keefe came to assist Detective Wiza, Carthans had fled, and distribution quantities of crack had been seized from the obstructive Johnson.  Was Carthans gone for good or was he circling back with a firearm to attempt to assist his compatriots while the numbers still were favorable?  Notwithstanding the defense team's professed skepticism, if this hadn't been a fast-moving, chaotic scene at the outset, it had become one.  Taking into account the totality of circumstances confronting the two officers, I conclude that the amount of forcible restraint they used to maintain control of Howard, Johnson and Williams was reasonable.

12

This includes the second weapons frisk of Howard. Although Howard contends otherwise, I have found as a fact that Officer O'Keefe did not know that Detective Wiza had frisked Howard's waist for weapons. Given the tumult confronting the officers, it was neither surprising nor unreasonable for this fact not to have been communicated. In any event, given the escalated uncertainty and perceived danger caused by Carthan's flight, Johnson's disobedience and physical resistence, the bag of crack and the blood spatters on all three men, it was reasonable for Officer O'Keefe to verify that Howard had no weapons at his disposal. The fact that Howard had his hands cuffed behind his back did not significantly reduce the need for a weapons frisk: handcuffed detainees remain capable of surprisingly agile feats, as Johnson demonstrated just a few minutes later in O'Keefe's squad car.

Although Howard has not raised the issue, I note that Officer O'Keefe's seizure of the crack cocaine from Howard's pocket during the weapons pat down was justified by the plain feel doctrine, which justifies "seizure of contraband plainly detected through the sense of touch." *Minnesota v. Dickerson*, 508 U.S. 366, 376-77 (1993); *United States v. Rivers*, 121 F.3d 1043, 1046-47 (7th Cir. 1997). As Officer O'Keefe testified, the incriminating character of the plastic bag of crack cocaine was immediately apparent to him when he patted the outside of Howard's pants pocket, before he began manipulating the rocks by pinching them. This justified his seizure of the crack.

That being so, there is no analytical need to consider Howard's contention that his post-arrest statements should be suppressed as derived from an illegal search. For completeness's sake, I will analyze this contention, but first I briefly address Howard's request, by counsel, that this court "concern itself with what appears to be a very cavalier policy followed by the Fitchburg

13

police department," namely, Detective Wiza's explanation that typically during high-risk contact between Fitchburg police and citizens "everyone is detained until they're at least [identified] and run through NCIC." Reply Brief, dkt. 31, at 2, n.1. With all respect for counsel's concerns, this issue is not before the court in Howard's case and this court does not offer advisory opinions. To the extent that a party in some other case deems it relevant to attempt to establish this policy as an organizational routine of the Fitchburg Police Department pursuant to F.R. Ev. 406, he or she may do so. If any citizens subjected to this policy believe that Fitchburg has violated their Fourth Amendment rights and wish to seek redress in this court, they may file a civil rights lawsuit making this claim.

Turning then to the question of attenuation, the government argues that if the police violated Howard's Fourth Amendment rights, Howard's post arrest statements should not be suppressed because the police obtained those statements by means sufficiently distinguishable to be purged of the primary taint. *See United State v. Conrad*, 673 F.3d 728, 733-34 (7th Cir. 2012). It is the government's burden to prove attenuation. First, it must prove that the statements were voluntary. *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003). Then the court needs to balance three factors: (1) the time elapsed between the Fourth Amendment violation and the acquisition of incriminating statements from Howard; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.; United States v. Conrad,* 673 F.3d at 733-34.

Here, Howard has not claimed that his statements were involuntary, so the threshold requirement is met. As for time lapse, the government claims that it wasn't until May 17 and 18, 2012 that Howard made the statements incriminating him in the federal charges. The

14

government does not point to any events that would attenuate any taint, although it notes that Howard was being detained as a suspect in a violent home invasion.  The government finally contends that there was no police misconduct here.  Given my conclusion that the officers did not violate Howard's Fourth Amendment rights, this resonates with the court; but if we assume that the officers *did* violate Howard's Fourth Amendment rights, it was not intentional or purposeful in the sense that the officers acted with *scienter* or had some scheme to arrest Howard on a pretense in order to provoke him to incriminate himself.

Howard argues in his reply brief that his statements "undoubtedly [were] prompted by his recognition that cocaine had been found in his pocket and the gig was up."  Dkt. 31 at 3.  But Howard never actually has testified to this (although he did offer some limited testimony on another topic at the suppression hearing).  Further, it does not advance the analysis for Howard to assert that he would not have incriminated himself regarding the crack cocaine in his pocket if the police had not found it.  It would be unusual for a criminal suspect to admit to felonious conduct about which the police were otherwise unaware.  The question is whether his decision to talk about it was preceded by sufficient intervening circumstances as to divorce that decision from any taint associated with the discovery of the crack.  It seems that it was, although the record is slim and the arguments are not well developed by either side.  If it were to matter, I recommend that the court find that the government has established attenuation by a very slim margin.

15

**RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that the court deny defendant Darius Howard's motion to suppress evidence.

Entered this 19th day of October, 2012.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

16

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin  53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

October 19, 2012

Rita Rumbelow
Assistant United States Attorney
660 West Washington Avenue, #303
Madison, WI 53703

William R. Jones
Jones Law Firm
P.O. Box 44188
Madison, WI 53744

      Re:    United States v. Darius Howard
             Case No. 12-cr-83-bbc

Dear Counsel:

      The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

      The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

      In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before October 29, 2012, by filing a memorandum with the court with a copy to opposing counsel.

      If no memorandum is received by October 29, 2012, the court will proceed to consider the magistrate judge's Report and Recommendation.

                    Sincerely,

                    /s/

                    Connie A. Korth
                    Secretary to Magistrate Judge Crocker

Enclosures

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the  full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;
(2) judgment on the pleadings;
(3) summary judgment;
(4) to dismiss or quash an indictment or information;
(5) to suppress evidence in a criminal case;
(6) to dismiss or to permit maintenance of a class action;
(7) to dismiss for failure to state a claim upon which relief can be granted;
(8) to dismiss actions involuntarily; and
(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation.  Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct  a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).**