IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| | OPINION AND ORDER |
| Plaintiff, | |
| | 12-cr-83-bbc |
| v. | |
| DARIUS HOWARD, | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In a report and recommendation entered on October 22, 2012, the United States Magistrate Judge recommended denial of defendant Darius Howard's motions to suppress evidence of the crack cocaine found in his possession during a frisk undertaken by the Fitchburg police and the statements he made to law enforcement after his arrest, while he was confined. Defendant has filed objections to the report, contending that the magistrate judge erred in several respects: (1) faulty factfinding; (2) relying upon a "bad" circuit opinion; (3) relying on the erroneous finding that it was right for the police to consider defendant "armed and dangerous"; (4) finding that intentional ignorance of other police activity excuses subsequent intrusive behavior; (5) rejecting any examination of systemic misbehavior by the police; and (6) concluding incorrectly that defendant's in-custody statements were not tainted by the initial Fourth Amendment violation. I conclude that the magistrate judge's conclusion was correct. The incident was not a model of police work, but

1

it did not violate defendant's constitutional rights under the Fourth Amendment.

BACKGROUND

The magistrate judge made extensive findings of fact about the circumstances under which defendant was stopped, searched and arrested on May 15, 2012. In brief, a Fitchburg, Wisconsin police detective, Matthew Wiza, observed a minivan he thought might contain Marcus Johnson, whom Wiza wanted to arrest for his alleged involvement in a pistol-whipping incident at a nearby bar earlier in the month. Wiza radioed for backup but did not wait for it to arrive before walking toward the van. About this time, Johnson stepped out of the van with another man, Christopher Carthans. Two other men got out of the van; one was defendant; the other was Ari Williams. Outnumbered and alone, with two men on one side of him and two men on the other, Wiza drew his gun and ordered all four to lie on the ground in an effort to stabilize the situation. Defendant and Williams complied; Johnson and Carthans did not.

A second officer, Michael O'Keefe, arrived and was told by Wiza to check on Johnson and Carthans. O'Keefe approached them with his gun drawn and ordered them to lie down. Both complied initially, but when Johnson kept reaching toward his body with his left hand despite O'Keefe's orders to stay still, O'Keefe decided he needed to handcuff him. As he did so, Carthans fled. O'Keefe got the handcuffs on Johnson and searched him, finding crack cocaine in Johnson's pocket. He also noticed what appeared to be blood stains on Johnson's pants and shoes. O'Keefe placed Johnson in the back seat of his squad car and locked the doors. He then went to assist Wiza, who by that time had handcuffed defendant, using the

2

only pair of handcuffs he had brought with him. O'Keefe saw that both defendant and Williams had what appeared to be blood spots on their pants. O'Keefe put handcuffs on Williams and then performed patdowns of both Williams and defendant, not knowing that Wiza had already done a quick patdown of defendant. O'Keefe detected what turned out to be a plastic bag of crack cocaine in defendant's right front pants pocket. He suspected it was a plastic sandwich bag because of the noise it made when he first patted it, the way it felt, his experience with previous patdowns and his discovery minutes earlier of crack cocaine in Johnson's possession. O'Keefe squeezed the bag between his fingers and felt a hard substance, strengthening his belief that it was bag of crack cocaine. He then reached into defendant's pocket and took out the bag, which did contain cocaine.

Shortly thereafter, City of Madison police arrived and told the Fitchburg officers that all four men were suspects in an armed home invasion that had occurred just 10-15 minutes earlier. Defendant was identified in a subsequent "show-up" conducted on the scene and taken into custody.

Some days later, defendant made statements to law enforcement. The record contains no further evidence about these statements, such as when they were made, whether they were incriminating or whether defendant was represented by counsel.

OPINION

The government defends the search and seizure in this case as a legitimate stop, authorized under Terry v. Ohio, 392 U.S. 1 (1968), which held that the Fourth Amendment

is not violated by a brief stop and questioning upon suspicion that a person may be connected with criminal activity, accompanied by a frisk for weapons if the officer suspects that the person may be armed. The circumstances of this case are a long way from the stopping and frisking of three men suspected of casing a store in Cleveland, Ohio, which was the situation in Terry, but the analysis is similar. In Terry, the attention of a police officer was drawn to two men making repeated trips past a particular store and then conferring with each other and at one point, with a third man. When the officer saw the third man return for a second conference with the other two, he approached the three, identified himself as a police officer and asked for their names. Unsatisfied with their mumbled answers, the officer grabbed Terry and spun him around. As he did so, he felt what seemed to be a pistol. He then walked the three into the store, removed Terry's overcoat and discovered a .38 caliber revolver in the pocket. He found a second revolver in the overcoat of a second man.

The Supreme Court found both the stopping and the frisking constitutional, while acknowledging that the men had not been arrested before they were searched. It recognized that in "appropriate circumstances" and in "an appropriate manner," a police officer may "approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Id. at 22. In addition, the officer may undertake a reasonable search for weapons for his own protection, "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Id. at 27.

As courts have recognized in a plethora of cases, what is reasonable in one situation

may be unreasonable in another. The test is whether the investigative detention is "reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the suspect's Fourth Amendment rights." Rep. & Rec., dkt. #33, at 8 (quoting United States v. Smith, ___ F.3d ___, 2012 WL 4676970 *5) (7th Cir. Oct. 4, 2012)). In Smith, the court of appeals held that in the circumstances of that case, in which Smith had been dropped off by the driver of an apparent getaway car after a bank robbery, officers conducting an investigatory stop did not violate Smith's rights when they approached him with guns drawn, handcuffed him and detained him for ten minutes. Their actions did not transform the investigatory stop into an arrest. Smith, 2012 WL 4676970 *5.

Defendant's case represents a slightly more difficult case than Smith's because he was not an obvious suspect when he was detained. However, courts have recognized that in some situations, the temporary detention of innocent civilians is necessary to secure a particular scene and protect the safety of the officers and others. Rep. & Rec., dkt. #33, at 8-9 (citing Bletz v. Gribble, 641 F.3d 743, 755 (6th Cir. 2011) (detention of persons without reasonable suspicion or probable cause is permissible only when officers making seizure do so out of justifiable fear of personal safety); United States v. Vaughan, 718 F.2d 332, 334 (9th Cir. 1983) (person found in car with criminal suspects could be detained briefly to determine whether any evidence found in possession of suspects incriminated him and could be frisked for weapons to protect officers' personal safety without violating Fourth Amendment); United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993) (officer acted

5

constitutionally in ordering driver out of car when she observed apparently loaded gun within his reach while she was talking to him).

Defendant was potentially an innocent civilian, but he was associating with a person wanted for a serious felony. Officer Wiza was outnumbered and had no reason to think that Johnson's companions would be on his side if he proceeded to put Johnson under arrest. The magistrate judge concluded that in these circumstances, it was reasonable for Wiza to direct the four men to the ground while he gained control over the scene and put Johnson under arrest. Defendant objects generally to this conclusion and objects in particular to the magistrate judge's conclusion that O'Keefe's search of him exceeded the bounds of reasonableness because Wiza had already frisked him.

Defendant begins by accusing the magistrate judge of faulty factfinding. As examples, he cites the magistrate judge's finding that the area in which Johnson was apprehended is a "high call-for-service" area. However, defendant has cited no evidence casting doubt on this characterization of the area. The testimony from the evidentiary hearing that defendant cites upholds Officer Wiza's testimony, which was that the area had been the subject of frequent complaints, disturbances and police contacts and that Wiza had been in the area "multiple times for weapon offenses." Hrg. trans., dkt. #26, at 43-44.

Defendant also criticizes the magistrate judge's reliance on the officers' subjective descriptions of the scene as being chaotic, moving very rapidly or a bad situation. Again, defendant has not shown that the descriptions were inapt. Most people would call it a bad situation when a lone officer is confronted by four men, one of whom he has good reason

to believe committed a violent felony 11 days earlier, even if they had doubts about the officer's judgment in getting into the situation in the first place. Even after O'Keefe arrived, the officers were still outnumbered and Carthans had taken off, possibly to round up allies or to obtain a gun. (In fact, it appears that his goal was to get rid of a gun, as officers found a 9 mm handgun in a dumpster when they took a canine along Carthans's route.)

Defendant responds by saying that by the time he was searched, he was on the ground and in handcuffs, Johnson was secured in the squad car and Cathans was gone from the scene. This may be true, but it does not mean that the scene was completely under control and the officers were out of danger. Carthans might have returned with reinforcements.

Defendant objects to the magistrate judge's finding that O'Keefe saw a bloody T-shirt on the floor of the minivan, but it is not necessary to discuss the accuracy of that finding. Whether O'Keefe saw it before or after he performed the patdown search of defendant does not matter; O'Keefe had adequate reasons for his brief search of defendant without adding the shirt to the calculus.

Finally, defendant says that the evidence does not support the magistrate judge's finding that O'Keefe was unaware that Wiza had already conducted a "quick partial frisk" of defendant. He says that it is not credible to believe O'Keefe's claim that he did not know of the prior frisk; he could see that defendant was already in handcuffs, which meant that Wiza had had his hands on him and presumably would have been able to pat him down at the time. The finding does not seem incredible in light of the fact that Wiza had been trying to handcuff defendant while trying to keep his gun on on him and on Williams. Defendant

asks whether anyone could honestly believe that Wiza did not tell O'Keefe that defendant had already been searched for weapons, but the answer is not so obviously "No" as to undermine the finding the magistrate judge made after hearing all the evidence and observing the demeanor of the witnesses. It is more reasonable to think that Wiza was telling the truth when he said that he had made only a quick frisk and had not had the opportunity to search for weapons.

Turning to the objection that the magistrate judge erred in relying upon a "bad" circuit opinion, I assume that defendant is actually referring to what he calls a "bad" *district court* opinion, because he cites United States v. Williams, 12-cr-54-wmc (Sept. 12, 2012), a case in which Judge Conley decided that the Fitchburg police were justified in searching Andre Williams. Williams was one of a group of men reported by an anonymous caller as "waving around guns, hollering and carrying on"; all were patted down by the police out of concern for their own safety and without any individualized suspicion. Defendant has not shown that Judge Conley erred in deciding the case as he did. In any event, the question is whether the decision in *this* case is right or wrong, not whether Williams was decided correctly.

Defendant argues that it was error for the magistrate judge to rely on the erroneous finding that the police were justified in considering defendant "armed and dangerous," but the magistrate judge did not make this finding or rely on it. He merely listed dealing with suspects who are considered armed and dangerous an example of the many different kinds of situations police officers may encounter. He recognized that "[t]he reasonableness of a

particular encounter depends . . . on the extent of the intrusion as well as the reason for the restraint" applied.  Rep. & Rec., dkt. #33, at 10.

Returning to his contention that O'Keefe must have known that defendant had been searched once by Wiza before O'Keefe searched him, defendant argues that the magistrate judge is endorsing intentional ignorance of other police activity as an excuse for subsequent intrusive behavior.  I have explained why defendant has not shown that it was error for the magistrate judge to believe O'Keefe when he said that he did not know that defendant had been searched for weapons by Wiza.  It follows that the magistrate judge's finding is not an endorsement of intentional ignorance.

Defendant objects to the magistrate judge's refusal to weigh in on the constitutionality of the Fitchburg Police Department's policy that in high-risk contact situations, "everyone is detained until they're at least [identified] and run through NCIC," dft.'s objections,  dkt. # 36, at 7 (quoting Wiza testimony, hrg. trans., dkt. #26, at 26), but he has failed to show that this issue was before the magistrate judge.  Defendant never raised any issue of systemic misbehavior until his reply brief, dkt. #33 at 14, and then only in a footnote.  He has forfeited this argument.

Finally, defendant contends that the magistrate judge erred in finding that defendant's in-custody statements were not tainted by the initial Fourth Amendment violation.  The magistrate judge found no initial Fourth Amendment violation, so there was no taint for him to consider.  I agree with this finding, so it is not necessary to consider defendant's argument about his statements.

9

ORDER

IT IS ORDERED that the report and recommendation entered by the United States Magistrate Judge on October 10, 2012 is ADOPTED by the court as its own and that defendant Darius Howard's motion to suppress the evidence of the crack cocaine found in his possession on May 15, 2012 is DENIED, as is his motion to suppress his post arrest statements on the ground that they were obtained from him as the result of an unreasonable search and seizure.

Entered this 2d day of November, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge